JASON J. BACH, ESQ.
Nevada Bar No. 7984
**THE BACH LAW FIRM, LLC**
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MICHELLE COX, individually, and as parent and next friend of M.C., <br><br> *Plaintiffs*, <br><br> v. <br><br> RYAN LEWIS, individually, and in his official capacity; JORGE PALACIOS, individually, and in his official capacity; and CLARK COUNTY SCHOOL DISTRICT, <br><br> *Defendants*. | Civil Action No. _____ <br><br> **COMPLAINT** <br> **(Jury Demanded)** |

COMES NOW, Plaintiff MICHELLE COX ("Mrs. Cox"), individually, and as parent and next friend of M.C. ("Plaintiffs"), by and through her undersigned counsel, and herby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

### INTRODUCTION

Mrs. Cox, individually, and as parent and next friend of M.C, brings this action asserting violations of her rights under the First Amendment and the Family and Medical Leave Act ("FMLA") and M.C.'s rights under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title II ("Title II") of the Americans with Disabilities Act ("ADA"), as well as state law claims for negligence and intentional infliction of emotional distress.

M.C. was bullied and threatened by a student that Defendant Clark County School District ("CCSD"), including Defendants Ryan Lewis and Jorge Palacios, knew posed a danger to other students.  When Defendants failed to take adequate action to address the bullying and threats, Mrs. Cox complained, only to have Defendants retaliate against her.  CCSD not only failed to protect M.C. from foreseeable harm, Defendants consistently took action to place M.C. in danger and in proximity to her bully, L., thereby causing and then exacerbating several emotional distress.  Over the course of nearly two years, CCSD consistently failed to adequately respond to reports of the bullying and threats by L., and Mrs. Cox's complaints that such reports had not been adequately addressed.

Defendants' actions led M.C. to develop severe depression and anxiety, interfering with her access to school.  Despite being aware of M.C.'s mental health conditions, CCSD took no action to identify M.C. as a student with a disability under Section 504 or provide necessary accommodations until Mrs. Cox specifically asked them to do so and, even then, failed to provide necessary accommodations and modifications, instead discriminating against M.C. and forcing her to withdraw form two separate schools.  Finally, Mrs. Cox, a CCSD employee, was forced to take FMLA leave to address M.C.'s needs.  While CCSD approved this leave, CCSD consistently interfered with Mrs. Cox's ability to take the leave, forcing her to perform work while out and penalizing her for taking leave, and then forcing her to resign by refusing to provide her further leave.

Accordingly, Mrs. Cox and M.C. now petition this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of their rights.

///

///

## PARTIES

1.      Plaintiff Michelle Cox is a resident of Clark County, Nevada.

2.      Plaintiff M.C., a minor, is a resident of Clark County, Nevada and resides there with her mother and next friend, Michelle Cox, and was at all relevant times a student in CCSD.

3.      Defendant Ryan Lewis is, upon information and belief, a resident of Clark County, Nevada and was at all relevant times the principal of Edith Garehime Elementary School in the Clark County School District.

4.      Defendant Jorge Palacios is, upon information and belief, a resident of Clark County, Nevada and was at all relevant times the assistant principal of Edith Garehime Elementary School in the Clark County School District.

5.      Defendant Clark County School District is a division of Clark County, Nevada operating a K-12 public school system that includes Edith Garehime Elementary School.

6.      At all times relevant hereto, and in all their actions described herein, Defendants' actions took place in Clark County, Nevada.

## VENUE & JURISDICTION

7.      Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), as the claims are based upon 42 U.S.C. § 1983, 29 U.S.C. § 2617(a)(2), 42 U.S.C. §§ 12101-12213 and 29 U.S.C. § 701, *et seq.*

8.       Supplemental jurisdiction over Plaintiffs' pendant state law claims are proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as their federal claims.

9.      Venue is proper in the District of Nevada pursuant to 28 U.S.C. 1391(b) in that the claims arose in this district, and Defendants are located in this district.

10.      Costs and attorney's fees are sought.

- 3 -

## GENERAL FACTUAL ALLEGATIONS

11.     During the 2018-2019 school year, Michelle Cox was employed by CCSD as a teacher at Edith Garehime Elementary School ("Garehime").

12.     During the 2018-2019 school year, M.C. was a fifth grade student at Garehime.

13.     That year, another student, L., was in M.C.'s class.  At the time he was placed in M.C.'s class, L. was known by CCSD and Garehime to have significant behavioral difficulties, including behaviors that posed a safety threat to other students.

14.     In fact, early in the fall 2018, Garehime principal Defendant Ryan Lewis and M.C.'s teacher, Ms. Kress developed a "safe word" that could be used when L. became violent in the classroom.

15.     Ms. Kress trained the class that when she spoke this "safe word, "the class was to immediately evacuate to another classroom.   In or around October or early November, Ms. Kress had the class conduct a drill to practice evacuating from the class.

16.     On November 30, 2018, L. threatened M.C., telling her, "When I am older, I'm going to murder somebody.  Somebody that used to annoy me, somebody like you."

17.     M.C. reported the threat, and the fact that she felt threatened, to Ms. Kress.

18.     Ms. Kress properly submitted a behavior event in Infinite Campus as a "Threat to Student," which should have immediately initiated a bullying investigation pursuant to CCSD's policy and Nevada Revised Statues ("NRS") 388.1351.

19.     Mrs. Cox spoke with Ms. Kress the following day during her personal time, and Ms. Kress assured her that the report had gone to Defendant Jorge Palacios, the Garehime assistant principal.  However, after a week passed by, Mrs. Cox questioned Mr. Palacios about the incident and what action had been taken, but Mr. Palacios was unaware of what she was talking about.

20.     Although Mr. Palacios acknowledged that L. had significant behavior and safety concerns, and said that he would look into the matter immediately, another week went by and Mrs. Cox heard nothing.

21.     On or about December 12, 2018, M.C. was summoned to the office and forced to sit face-to-face with L. while he was made to apologize to her.

22.     This charade encounter and forced apology completely terrified M.C.   When M.C. was at home that night with her parents, she expressed how upset she was with the way that Mr. Palacios handled the situation and that she no longer felt safe at school and did not want to attend. To her parents' horror, M.C. told them she did not want to live anymore.

23.     The following day, Mrs. Cox spoke with Mr. Lewis and informed him how M.C. was feeling after her life had been threatened by L.

24.     Shockingly, Mr. Lewis later called M.C. into his office and, with respect to the bullying that she had been subjected to, told M.C., "This is how the world is. This kind of thing is always going to happen."

25.     M.C. then expressed concerns about feeling unsafe at recess as a result of L.'s actions towards her.  On December 14, 2018, Mrs. Cox again spoke with Mr. Lewis and expressed her dissatisfaction with how the situation was being handled and informed him of the concern with recess.

26.     At this point, there had been no investigation and no one had interviewed M.C. about the threat, nor had M.C. or her parents heard from CCSD Police.

27.     Accordingly, Mrs. Cox asked Mr. Lewis to confirm what time the CCSD Police were called, assuming that they had been, as is protocol, Mr. Lewis indicated they had not, responding that L. was "protected."

28.     Mrs. Cox then indicated if Mr. Lewis couldn't remove L. to keep M.C. safe during recess, the school would need to put M.C. somewhere else during that time, to which Mr. Lewis agreed.

29.     Mr. Lewis had a practice of failing to investigate bullying incidents and actively suppressed reporting of such incidents to avoid investigations.  In fact, in staff meetings and trainings in both 2017 and 2018, Mr. Lewis explicitly had instructed staff not to describe any reported incidents as "bullying," but to instead label them simply "unacceptable behavior."

30.     It was only later, after Mrs. Cox's inquiry, that Mr. Lewis finally called CCSD Police.

31.     However, CCSD Police did nothing.  When they did contact Mrs. Cox, they pulled her out of class while she was teaching but gave her practically no information and no assurance that anything was being done.  Instead, the officer only laughed at her and made other inappropriate comments.

32.     Over the next few days, M.C. told her parents she still felt unsafe and uncomfortable as a result of L.

33.     Mrs. Cox again approached Mr. Lewis about the situation on or about December 17, 2018.  Because CCSD and Garehime would not move L., Mrs. Cox agreed to have M.C.'s lunch and writing classes changed so that she could feel safe at school.  The change was to occur following the winter break.

34.     However, M.C. reported to her parents that L. was continuing to stare at her in class, snarl at her in the hallways, and other behaviors that made her feel targeted and harassed.  As a result, M.C.'s father sent an email to Mr. Lewis asking for L. to be removed because clearly he was creating a hostile environment for M.C., or, if Garehime still refused to remove L. to move M.C.'s classes immediately.

35.     The following day, on December 19, 2018, after Mrs. Cox dropped off her students for other instruction, she used her personal time to check on M.C. and discovered that M.C. had not been removed from the class as requested.

36.     Mrs. Cox took M.C. out of class and went to Mr. Lewis, as M.C.'s parent, to see why she had not been moved.

37.     Mrs. Cox asked Mr. Lewis if he planned to address the class switch.  In response, Mr. Lewis lashed out at Mrs. Cox, yelling, "You need to watch your attitude!"

38.     Mrs. Cox was stunned that Mr. Lewis would speak to her in that manner while she was presenting a concern as a parent of a student.  Mr. Lewis had always permitted Mrs. Cox to address parent concerns during her personal time and breaks in the day and had never told her that doing so was a problem.

39.     However, it was clear that Mr. Lewis was now treating her as an employee and subordinate, rather than a parent, and Mrs. Cox immediately feared a negative impact on her job.  As a result, Mrs. Cox let Mr. Lewis know that she would not speak with him further without her union representative.

40.     She additionally stated she would be filing a complaint with CCSD regarding the handling of L.'s bullying of M.C.

41.      Mr. Lewis eventually said he would handle the situation.  However, as a result of his delay, M.C. was unable to change classes that day and had to be picked up and taken home early.

42.     The next day, December 20, 2018, Mr. Lewis directed Mrs. Cox to sign a "Notice of Investigatory Review."  The Notice indicted that she was to meet with Mr. Lewis on December 21, 2018, to discuss her purported failure to "model high personal and professional standards," "handle personal business appropriately while at work," and "to maintain confidentiality of student

information" on the morning of December 19, 2018, a clear reference to her discussion with Mr. Lewis regarding her concern that M.C. had not been moved from her classes.

43.     Mrs. Cox subsequently emailed Mr. Lewis's supervisor, Jefferey Hybarger, outlining the events and Garehime's failure to address the bullying, as well as informing him of Mr. Lewis's retaliation for her complaints and concerns.  She also spoke with Mr. Hybarger that evening about her concerns, and he promised to investigate.

44.     The stress of Garehime's failure to address the situation and Mr. Lewis's retaliation exacerbated Mrs. Cox's medical condition, a potential consequence she had warned Mr. Lewis about, causing her to become seriously ill the following day and ultimately sending her to the emergency room.

45.     On January 8, 2019, Mrs. Cox filed a SafeVoice report regarding the incident of bullying against her daughter because CCSD still had not done anything to address the bullying and M.C.'s safety.

46.     Her SafeVoice report was the first official report of the incident, as the school administration never filed a report on the day of the incident, despite CCSD policy requiring such a report.

47.     Mrs. Cox had her disciplinary meeting with Mr. Lewis the following day, which also was attended by Mr. Palacios.  During the meeting, Mrs. Cox felt she was being attacked and subjected to a hostile working environment.

48.     After Mr. Lewis and Mr. Palacios left the meeting, and went into an office next door, Mrs. Cox overhear Mr. Lewis say to Mr. Palacios, "This is how we are going to get her!"

49.     After observing Mrs. Cox's work environment, her union representative told her that she should transfer schools, which was devastating to Mrs. Cox as she had been part of Garehime Elementary school for 8 years either as a parent or as a teacher.

50.     On the same day as her disciplinary meeting, Mr. Palacios informed Mrs. Cox that a "full investigation" had now been completed regarding L.'s threat against M.C.'s life and that the incident was not being deemed to be bullying, a determination confirmed in a letter dated January 10, 2019.

51.      However, while both L. and M.C. were finally interviewed as part of the delayed investigation, the student who witnessed the event was not and Mr. and Mrs. Cox were not, despite the requirements of statute.  Nonetheless, Mr. Palacios falsely marked on the report that he had in fact interviewed witnesses.

52.     Mrs. Cox and her husband then met with Mr. Hybarger to discuss their concerns with how the situation was being handled.  However, Mr. Hybarger would not tell them why the incident was not being deemed bullying or why an investigation had not been immediately opened the day the incident was reported.

53.     Mrs. Cox expressed concern about retaliation.  In response, Mr. Hybarger indicated she would have a note in her file but nothing negative would appear in her evaluation.

54.     She also told Mr. Hybarger that the situation was causing her severe anxiety and had made her ill.

55.     On January 14, 2019, Mr. Cox met with Mr. Lewis and Mr. Palacios regarding the bullying incident and the results of their "investigation."  Mr. Lewis and Mr. Palacios made clear they had concluded it was a "he said/she said" situation and, thus, they could not confirm bullying.

56.     However, they admitted that no one besides M.C. and L. had been interviewed and that they did not consider or investigate L.'s subsequent threatening and bullying behavior, including the staring, snarling, and intimidation.  Further, L. admitted threatening M.C. in December, and thus there was no disagreement over what had occurred.

- 9 -

57.     Mr. Cox could not understand how L. threatening to kill his daughter did not constitute "placing a person in reasonable fear of physical harm to the person," or "creating an intimidating or hostile educational environment for the person," or "substantially interfering with the academic performance of a student or the ability of the person to participate in or benefit from the services, activities or privileges provided by a school," as outlined by NRS 388.122 and CCSD bullying policy.

58.     Throughout January and February 2019, M.C. began to experience more extreme anxiety, including panic attacks, due to seeing her bully at school daily.  Sometimes, she would be sent home early from school, or not attend at all, because of her mounting anxiety.

59.     Then, on February 27, 2019, Dr. Michael Tanner diagnosed M.C. with Depression and Generalized Anxiety Disorder and prescribed her anti-depressants to help her cope with the trauma.

60.     During this process, M.C. revealed that the bullying by L. had begun well before November 2018, a fact that a proper investigation would have uncovered.

61.     Despite the medication, M.C. still experienced extreme anxiety and depression so severe that she intentionally "cut" herself with scissors one day while at school and was sent home early.

62.     On March 22, 2019, M.C. had her first meeting with a therapist, Ms. Prewitt, who discovered that M.C. had a suicide plan to hang herself from her bunk bed.

63.     Ms. Prewitt directed M.C.'s parents to take her to the emergency room at once, resulting in M.C. being placed on suicide watch, requiring her to always be with an adult and to sleep in the same room as her parents.

64.     Mrs. Cox informed Mr. Lewis of the events, including the suicide threat and prior bullying, immediately, and told him that M.C. should not be left alone.

65.     The following day, Mrs. Cox found a scarf with a knot tied in it on the top of M.C.'s bunk bed, and subsequently had the bunk bed dismantled.  M.C.'s doctor continued to keep her on suicide watch and increased her medication dosage.

66.     On April 25, 2019, Mrs. Cox received her end-of-year evaluation.  She was not given time to review or discuss her evaluation and was told that she must sign it quickly.  However, she did see that she was given 3s in all areas of her evaluations, despite her documenting her achievements throughout the year, including four outstanding observations, and submitting evidence of such to her evaluators.

67.     Mr. Palacios told her that, "*Everybody* gets 3s, you can have time next week to fight for higher scores.  Just sign it now because it is due, and I have too many I need signed."

68.     Mrs. Cox later found out that many teachers who did not provide a single piece of evidence of their outstanding performance, as Mrs. Cox did, received a higher score of 4s on their evaluations.

69.     The following day, Mrs. Cox asked to see her evaluation again and noted that, under the "Area for Growth" section, it stated, "Mrs. Cox will model integrity in all interactions with colleagues, students, families, and the community."  Confused, Mrs. Cox asked Mr. Palacios what that meant, but he did not give her an answer.

70.     Mrs. Cox later asked Mr. Palacios for a copy of her evaluation, but he said he could not release it without permission from Mr. Lewis.  When Mrs. Cox asked Mr. Palacios to call Mr. Lewis and ask permission to release her evaluation, he refused.

71.     Mrs. Cox then went to Mr. Hybarger and Mr. Grant Hanevold, school associate superintendent, to try to figure out why she was being retaliated against in her professional capacity after Mr. Hybarger promised she would not be.

72.     Mr. Hybarger then informed Mrs. Cox that Ms. Ann Hembrook, another school associate superintendent, was now in charge and that Mrs. Cox would have to speak with Ms. Hembrook.

73.     Mrs. Cox then relayed the timeline of events and issues, including the mishandling of the bullying investigation and the subsequent retaliation, to Ms. Hembrook, copying Mr. Hanevold and the CCSD Superintendent Jesus Jara.

74.     In response, Ms. Hembrook defended what was written in Mrs. Cox's end-of-year evaluation despite the fact that Mrs. Cox had shown herself to be a model teacher throughout the year, had never had any prior integrity issues, and never received a parent complaint, only praise. Ms. Hembrook also informed Mrs. Cox that she had no way of determining what her evaluation should have been and therefore did not fully investigate.

75.     On May 2, 2019, most of M.C.'s class was taking the state assessment.  However, Mrs. Cox had opted M.C. out of the assessment, as permitted.

76.     Though Mrs. Cox had reminded M.C.'s teacher, Mr. Dixon, that M.C. needed to be kept away from L., M.C. ultimately was forced to sit next to L. during the assessment period. Upon information and belief, Mr. Lewis and Mr. Palacios were aware that M.C. would be with L.

77.     When Mrs. Cox discovered this, she called her husband, and he called Mr. Lewis and left a message.

78.     A few minutes later, while Mrs. Cox was walking into the teacher lounge to use the bathroom, she overheard staff say, "Mr. Cox called" to Mr. Lewis and Mr. Palacios.  Not noticing that Mrs. Cox was within earshot, Mr. Lewis commented that, "He [Mr. Cox] is only doing this because of her bad evaluation."  Once they noticed that Mrs. Cox was there, they immediately stopped talking.

79.     When Mr. Lewis finally called Mr. Cox back, Mr. Lewis informed Mr. Cox that M.C. allegedly was given the option to either sit in the computer lab with her class and read a book for three hours while they took the state assessment, or she could sit in the room with L. and Mr. Dixon.

80.     Mr. Dixon assured M.C. that he would keep L. away from her, but she ended up sitting with him at the same art table.

81.     When her parents asked her why she chose to stay with Mr. Dixon, M.C. said that she was afraid to say "no."    Although M.C. had begun to recover and had been on a good path until that point, M.C. experienced a three-hour anxiety attack later that evening due to having had to endure sitting next to L. that day.

82.     Mrs. Cox relayed these events to Mr. Hanevold, Ms. Hembrook, Ms. Hembrook's supervisor, and Superintendent Jara.

83.     On May 20, 2019, Mr. and Mrs. Cox again met with Mr. Hanevold and Ms. Hembrook to express their significant concerns about CCSD's Bullying and Cyberbullying Policy not being followed and the effect it was having on M.C., specifically her suicidal ideation.  Mr. Hanevold and Ms. Hembrook promised to investigate.

84.     In June 2019, Mr. Hanevold and Ms. Hembrook completed their investigation but informed Mrs. Cox that she could not know the outcome.

85.     As suggested by her union representative, Mrs. Cox transferred schools for the 2019-2020 school year.  M.C. additionally moved schools, entering sixth grade at Leavitt Middle School ("Leavitt").

86.     M.C. continued to have difficulty in school at Leavitt, frequently missing school or requiring her mother to pick her up as a result of her depression and severe anxiety.

87.     In late October 2019, after several months of frustration attempting to get clarity on the outcome of the investigation by Mr. Hanevold and Ms. Hembrook, Mrs. Cox emailed a CCSD trustee, Lola Brooks, a second time to ask with whom she could speak to have the investigation by Mr. Hanevold and Ms. Hembrook reviewed and all of CCSD's missteps, including retaliation for her complaints, addressed.

88.     Ms. Brooks initially indicated that she referred Mrs. Cox's inquiry to Dr. Jara who would have Deputy Superintendent Dr. Diane Gullet call her.

89.     Confusingly, however, it was Ms. Hembrook who reached out to Mrs. Cox informing her that Dr. Jara and Dr. Gullet had put Ms. Hembrook in charge of the investigation Mrs. Cox had requested.

90.     Following several additional emails with Ms. Brooks and Dr. Gullet, Ms. Brooks directed Mrs. Cox to Joe Caruso, who oversees the public complaint process.

91.     Mrs. Cox provided information to Mr. Caruso and also requested that someone other than Ms. Hembrook investigate.   Dr. Gullet ultimately assigned Dr. Tammy Malich, an Assistant Superintendent, to investigate.

92.     Dr. Malich conducted an investigation, including speaking with other parents who had complaints about Mr. Lewis' bullying of students and staff.

93.     Dr. Malich did not provide Mrs. Cox with the results of her investigation until February 2020.  Her letter, dated January 22, 2020, stated,

> My findings regarding the November 30, 2018, incident are in agreement
> with the original event identification by Ms. Kress of "Threat to Student."
> The Garehime administration, however, did not conduct an investigation
> into the threat nor make an evaluation regarding a threat assessment.
> Regarding the bullying allegation submitted into SafeVoice on January 8,
> 2019, I am in disagreement with the findings designation of
> "unsubstantiated" by the Garehime administration.  I find the bullying
> allegation to be substantiated.  The school administration did not conduct
> an adequate investigation into this matter and also did not completely
> follow the bullying protocol.  The student witness that was named was not

interviewed nor were parents interviewed as indicated on the Written Report of Findings, but required under statute.  Furthermore, the school created the climate and conditions to perpetuate the presence of bullying.

94.     Dr. Malich did not examine Ms. Hembrook's investigation or any action, or lack of action, taken as a result of that investigation.

95.     Further, despite her findings of multiple failures, Dr. Malich informed Mrs. Cox that CCSD was requiring only an unspecified "corrective action plan" from Garehime administration.

96.     Despite inquiries, CCSD would not tell Mrs. Cox what actions were taken to address the failures of Garehime administration, nor did CCSD take any further steps to address M.C.'s needs.  Upon information and belief, no disciplinary action was ever taken against Mr. Lewis or Mr. Palacios.

97.     Mrs. Cox filed an appeal of the decision and the recommended action on February 6, 2020, with the Nevada Department of Education ("NVDOE").  The NVDOE agreed that the bullying policy had not been followed but indicated it would not address Mrs. Cox's claims regarding the failure to take further action, including discipline against administrators.

98.     M.C. continued to struggle with severe anxiety and depression throughout the 2019-2020 school year and has required ongoing medical treatment, therapy and medication support, and she missed substantial periods of school due to the impacts of Defendants' actions.

### **FIRST CAUSE OF ACTION**

***FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)***
**Against Defendant Clark County School District**
**and Defendants Lewis and Palacios**

99.     Each of the allegations set forth in paragraphs 1 through 98, inclusive, are hereby incorporated by this reference as if realleged fully herein.

100.    Mr. and Mrs. Cox made numerous complaints, jointly and individually, to CCSD, including Garehime administrators Mr. Lewis, Mr. Palacios, Mr. Hanevold, Mr. Hybarger, Ms. Hembrook, Dr. Gullet, Trustee Brooks, and Superintendent Jara regarding Garehime's failure to investigate and address L.'s bullying of M.C.

101.    Mrs. Cox's complaints about Garehime's failure to address the bullying and comply with the state bullying statute, as well as later complaints about Mr. Lewis's bullying of M.C. and general bullying of others, were made in her capacity as a parent.

102.    Mr. and Mrs. Cox therefore engaged in protected activity.

103.    In response to those complaints, Mr. Lewis reprimanded Mrs. Cox.  His reaction was such that she feared for her job and was unwilling to speak with him further without her union representative.  Mrs. Cox then had Mr. Cox serve as the primary point of communication with Mr. Cox.

104.    On December 20, 2018, Mr. Lewis initiated disciplinary action against Mrs. Cox as a result of her complaints.

105.    Additionally, despite submitting significant evidence supporting her performance, Mrs. Cox received a lower evaluation score than she otherwise would have, and a lower score that numerous other teachers, who had not complained, had received despite the fact that those teachers had provided no supporting evidence of their performance.

106.    These actions occurred despite the fact that Mrs. Cox complained and consistently expressed concern about the threatened and already occurred retaliation to higher level administration.  In response to her complaints, she was told simply not to worry.

107.    Principals are entrusted with responsibility for and final say over initiating an investigatory review and evaluating staff.

108.    Mrs. Cox complained about these actions to Mr. Hembrook, CCSD Trustee Lola Brooks, and Dr. Jara, but no action was taken and CCSD provided no avenue for review or appeal. Ms. Hembrook in fact confirmed she could not fully investigate the retaliation.

109.    Numerous other staff have complained about CCSD's pattern and practice of retaliation against staff and parents who complain, such that other parents and staff were scared to come forward when Mrs. Cox reported her complaints to Ms. Hembrook and then Dr. Malich.

110.    CCSD has a pattern and practice of permitting principals to retaliate against staff and parents who complain.   Other staff and parents who have complained have experienced retaliation and have found that CCSD took no action in response to reports of retaliation.

111.    As a result of Mr. Lewis and Mr. Palacios's actions and the hostile environment they created, Mrs. Cox had no choice but to transfer from Garehime.

112.    Mrs. Cox suffered harm to her professional reputation and prospects for advancement, emotional damages and mental distress, and exacerbation of her medical condition requiring emergency medical treatment.

113.    It has been necessary for Mrs. Cox to obtain the services of an attorney to prosecute this action, and she is entitled to an award of attorney's fees and costs of suit incurred herein.

## SECOND CAUSE OF ACTION

### *FMLA INTERFERENCE*
### Against Defendant Clark County School District

114.    Each of the allegations set forth in paragraphs 1 through 98, inclusive, are hereby incorporated by this reference as if realleged fully herein.

115.    The Family and Medical Leave Act, 29 U.S.C § 2612, provides eligible employees with up to twelve weeks of to care for a family member, including a child, with a serious health condition.

116.   Leave to care for a child with a serious health condition may be taken intermittently where medically necessary.

117.   Under 29 U.S.C. § 2615(a)(1), employers are prohibited from interfering with an employee's use of FMLA leave, including by requiring the employee to perform work while on leave, subjecting the employee to negative employment consequences for taking leave, or threatening the employee with such consequences.

118.   On May 7, 2019, Mrs. Cox applied and was approved for intermittent FMLA leave based on M.C.'s mental health conditions where necessary to take M.C. to her appointments and address any crises.

119.   M.C. frequently needed to be picked up early from school as a result of her anxiety and depression towards the end of the 2018-2019 school year and in the beginning of the 2019-2020 school year.

120.   Mrs. Cox utilized her FMLA leave to do so, at one point taking an approved block of time as a result of an extended crisis.  Each of these absences was a qualifying absence for FMLA purposes, and Mrs. Cox complied with all of CCSD's FMLA requirements.

121.   Though Mrs. Cox left sub plans for her FMLA absences, CCSD frequently called her to demand that she develop new or additional plans while she was out on leave and imposed on her other work responsibilities.

122.   The administration at her new school additionally complained about the sub plans she had completed, and her inability to work on leave, both to her and to her colleagues, so much so that her colleagues reported these complaints to her.

123.   CCSD further told Mrs. Cox that she would need to predict whenever she might be out on intermittent leave, an impossibility given her daughter's needs, or plan to work during her leaves in the future.

124.     When Mrs. Cox expressed that CCSD's demands that she work while on leave and their conditions on taking intermittent leave were interfering with her ability to care for her daughter, her supervisor told that she had to resign.

125.     The implication of this statement was that, if she did not acquiesce to the demand to work while on leave, or resign, she would be terminated.  Termination would be devastating to her ability to work as a teacher in the future, in CCSD or any other district.

126.     No other alternatives were offered, despite the fact that Mrs. Cox had FMLA time remaining and CCSD had a leave of absence policy.

127.     Given no choice, Mrs. Cox resigned on October 2, 2019, costing her not only her job and access to benefits, but also her chance at having the loans she had taken out for her degree—which required continuous employment in the district—forgiven.

128.     When Mrs. Cox learned a brief time later that she should have been permitted to take ongoing leave or a leave of absence, she requested that CCSD rescind her resignation and place her on leave.  CCSD refused to do so.

129.     Following her resignation, Mrs. Cox sought to at least substitute teach for CCSD, but CCSD delayed in processing her application.

130.     Mrs. Cox's October 2019 email request to CCSD Trustee Lola Brooks also asked who she could speak to about the issues with her FMLA leave, required resignation, and delay of substitute application.

131.     Dr. Malich ultimately told Mrs. Cox that she could not be reinstated or placed on leave and indicated she simply would need to reapply to teach the following year.

132.     No further steps were taken in response to Mrs. Cox's complaint.

133.   Mrs. Cox was eligible and approved for FMLA leave for absences related to M.C.'s conditions.   She was entitled to take such leave intermittently, as such leave was medically necessary to care for M.C. given her serious health condition.

134.   Mrs. Cox complied with all CCSD policies in taking her leave.

135.   CCSD's actions interfered with and denied Mrs. Cox her FMLA rights, and CCSD was aware that such actions would interfere with her rights.

136.   CCSD is liable to Mrs. Cox for her lost wages, salary, employment benefits, and other compensation resulting from this violation, interest on the same, liquidated damages, and costs and fees, including attorney's fees, as provided by 29 U.S.C. § 2617.

137.   Additionally, Mrs. Cox is entitled to reinstatement and restoration of benefits, including, but not limited to, retirement benefits, seniority and tenure rights, and credit for probationary teaching, as provided by 29 U.S.C. § 2617.

### THIRD CAUSE OF ACTION

*VIOLATION OF SECTION 504 OF THE REHABILIATION ACT OF 1973 and TITLE II OF THE AMERICANS WITH DISABILITIES ACT*
**Against Defendant Clark County School District**

138.   Each of the allegations set forth in paragraphs 1 through 98, inclusive, are hereby incorporated by this reference as if realleged fully herein.

139.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

140.   Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794

141.   CCSD is a public entity under Title II and receives federal financial assistance and is therefore covered by Section 504.

142.   M.C. was a qualified individual with a disability under both Title II and Section 504 by virtue of her enrollment in and entitlement to attend public school and her mental health conditions, which were mental impairments substantially limiting major life activities.

143.   Both Title II and Section 504 require schools to make accommodations and modifications necessary to enable a student with a disability to have equal and meaningful access to the school and educational program.

144.   During October 2019, seeing the continuing impact that M.C.'s anxiety and depression had, Mrs. Cox requested that CCSD evaluate M.C. for a Section 504 plan.

145.   Despite knowing about M.C.'s anxiety and depression since December 2018, and its significant impact on her at school, as well as CCSD's obligations under Title II and Section 504, no one at CCSD had previously considered M.C.'s need for accommodations.

146.   M.C. was found eligible as a student with a disability under Section 504 and a 504 plan was developed for her in November 2019.

147.   M.C.'s 504 plan included accommodations of extra time on homework and assignments of up to 2 days, as well as home support in the event of more than 2 days of absences.

148.   During the 504 process, M.C. had significant absences and was sent home twice for expressing suicidal thoughts and was not permitted to return until she was cleared by her psychiatrist.  Mrs. Cox communicated frequently with the school, who was aware her absences were related to her mental health conditions.

149.    Mrs. Cox additionally requested that M.C. be permitted to be fully enrolled at Leavitt but attend school for partial days as she worked up to success, as her anxiety often was exacerbated by lengthy days.

150.    Leavitt initially agreed, in fact stating a similar plan had been used to support a student with school anxiety in returning to school, and plans were discussed for M.C. to pursue a part time schedule as an accommodation.

151.    However, in early December 2019, Mrs. Cox was informed that M.C. had been withdrawn from her full time enrollment and instead enrolled only in Orchestra.  She was told by the assistant principal that because she did not attend classes daily she would receive all Fs on her transcript and that "[M.C.] was killing [Leavitt's] daily attendance" and thus she was withdrawn retroactive to October 10, 2019.

152.    When Mrs. Cox inquired further, including about the plan for M.C. to return on a part time schedule, she was suddenly told that a part time schedule was not available and M.C.'s only option was to attend Leavitt full time.  This decision was not made by the Section 504 team.

153.    As a result of Leavitt's refusal to accommodate M.C., Mrs. Cox was forced to withdraw M.C. and enroll her in CCSD's Nevada Learning Academy ("NVLA"), an online learning option that, for middle school students, included two face-to-face meetings per week.

154.    M.C. struggled with her grades at both Leavitt and NVLA as a result of her anxiety and depression.  In significant part, her anxiety and depression sometimes caused her to be unable to complete her work within the normal time frame, and the 2 days provided as an accommodation by her 504 plan was not sufficient.

155.    Despite being aware that M.C. required additional accommodations, no one at Leavitt or CCSD took any action to address her needs or revise her 504 plan.

156.    In fact, when M.C. entered NVLA, CCSD reduced the accommodations on her 504 plan.

157.    In late March 2020, Mrs. Cox informed M.C.'s NVLA counselor that M.C. was struggling with a particularly severe bout of depression and temporarily unable to complete school work.

158.    M.C. improved through April, though in mid-April her grades were still Ds, and Mrs. Cox informed NVLA they were working through her remaining classwork.

159.    In mid-May, NVLA confirmed M.C.'s schedule for the following year.  However, on June 1, 2020, NVLA emailed Mrs. Cox to inform her that M.C. was not welcome back and would not be permitted to enroll in NVLA because she "did not meet the requirements of being a successful online learner."

160.    Upon information and belief, NVLA's decision was based on M.C.'s delay in completing her classwork and her effective absences caused by her anxiety and depression, and her resulting grades.

161.    CCSD was aware M.C. was suffering from depression and anxiety as early as December 2018.  By March 2019, at the latest, CCSD was aware that this depression and anxiety was significant enough to substantially limit major life activities such that M.C. was a student with a disability under Section 504.

162.    Further, CCSD was aware that M.C. required accommodations and modifications as a result of her disability, including those related to attendance, continuous adult supervision, time to complete class work, class scheduling, and efforts to keep her away from L.

163.    Despite this knowledge, CCSD took no steps to identify M.C. as a student with a disability under Section 504 or convene a team of knowledgeable persons to determine what her

accommodation and modification needs were until November 2019, after Mrs. Cox made a request.

164.    Further, both before and after November 2019, CCSD failed to provide those accommodations and modifications it knew M.C. required as a result of L.'s harassment and bullying by intentionally placing M.C. with L., denying M.C. additional time to complete her assignments, denying M.C. a modification to the attendance policy or class scheduling to allow her to reenter school gradually, withdrawing her from Leavitt and telling her the only way she could continue was to attend full time, and then preventing her from continuing at NVLA.

165.    CCSD's failure to accommodate M.C. in turn exacerbated her conditions, resulting in M.C. being sent home and prohibited from returning until she had yet another note from her physician, missing additional school, and requiring additional time to complete her work.

166.    As a result of CCSD's failure to provide necessary accommodations and deliberate indifference to M.C., M.C. was denied equal access to CCSD's programs and education and was ultimately forced to withdraw from Leavitt and not permitted to continue, and then similarly withdrawn from NVLA.

167.    M.C. is therefore entitled compensatory damages and all other relief permitted by Section 504.

168.    It has been necessary for M.C. and her parents to obtain the services of an attorney to prosecute this action, and they are entitled to an award of attorney's fees and costs of suit incurred herein.

### **FOURTH CAUSE OF ACTION**

#### *NEGLIGENCE*
#### Against All Defendants

169.    Each of the allegations set forth in paragraphs 1 through 98, inclusive, are hereby incorporated by this reference as if realleged fully herein.

170.    CCSD, Mr. Lewis and Mr. Palacios owed M.C. a duty of reasonable care to protect her from foreseeable harm.

171.    At all times, Mr. Lewis and Mr. Palacios were acting within the scope of their employment such that CCSD is vicariously liable for their conduct;

172.    CCSD and Mr. Lewis and Mr. Palacios knew that L. exhibited significant behavior problems and presented a threat to the safety of other students.

173.    CCSD, Mr. Lewis and Mr. Palacios breached their duty of care to M.C. by:

a.  Assigning a dangerous student to M.C.'s class without taking appropriate precautions to supervise such student and ensure he did not present a threat to other students;

b.  Failing to take reasonable steps to protect M.C. from L., including sufficiently supervising L. to identify and prevent his bullying and threats, including as required by NRS 388.1351;

c.  By failing to address the occurrence of bullying and harassment by L., including the threat to M.C.'s life and subsequent aggressive actions, including as required by NRS 388.1351;

d.  By failing to appropriately investigate L.'s threats and bullying, including as required by NRS 388.1351;

e.  By exacerbating the harm to M.C. by forcing M.C. to confront L. and listen to his forced apology;

f.  By cultivating an environment that allowed bullying to flourish, including in contravention of NRS 388.1351.

174.    As a proximate result of Defendants' actions or inaction, M.C. suffered severe mental and emotional injuries, and resulting physical symptoms, and has required extensive medical treatment.

175.    It has been necessary for M.C. and her parents to obtain the services of an attorney to prosecute this action, and they are entitled to an award of attorney's fees and costs of suit incurred herein.

### FIFTH CAUSE OF ACTION

*INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*
**Against Defendants Lewis and Palacios**

176.    Each of the allegations set forth in paragraphs 1 through 98, inclusive, are hereby incorporated by this reference as if realleged fully herein.

177.    Defendants Lewis and Palacios were aware that L. was bullying and had threatened M.C., and that such bullying and threats had caused her severe emotional distress, and, in December 2018 and March 2019, had caused M.C. to become suicidal.

178.    Defendants Lewis and Palacios were further aware that M.C. was to be kept away from L., and that encounters with L. caused M.C. additional trauma.

179.    Despite this knowledge, Defendants Lewis and Palacios persistently continued to expose M.C. to L., including through a forced apology with L., continuing to place M.C. in classes with L., intentionally failing and refusing to take further steps to ensure M.C. did not encounter L., and, in May 2019, permitting Mr. Dixon to place L. directly next to M.C. for an entire day.

180.    Defendants Lewis and Palacios' actions intended to cause or were taken with reckless disregard for the likelihood that they would cause M.C. severe emotional distress, and such actions did in fact cause M.C. severe emotional distress.

181.    As a proximate result of Defendants' actions, M.C. suffered severe mental and emotional injuries, and resulting physical symptoms, and has required extensive medical treatment

182.     It has been necessary for M.C. and her parents to obtain the services of an attorney to prosecute this action, and they are entitled to an award of attorney's fees and costs of suit incurred herein.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Honorable Court enter judgment in their favor, and against the Defendants: (a) for back pay, front pay and/or reinstatement of Mrs. Cox and restoration of all employment benefits, along with liquidated damages; (b) for compensatory damages from Defendants in an amount to be determined at trial; (c) for punitive damages from the Individual Defendants in an amount to be determined at trial; (d) for interest; (e) together with the costs and disbursements of this action and such other attorneys' fees, pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 2617; and (f) further relief as justice requires.

DATED this 25th day of September, 2020.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

_/s/ Jason J. Bach_____
Jason J. Bach, Esq.
Nevada Bar No. 7984
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
jbach@bachlawfirm.com
*Attorney for Plaintiffs*