1

2

3

4                     UNITED STATES DISTRICT COURT

5                          DISTRICT OF NEVADA

6                                * * *

7    MICHELLE COX,                          Case No. 2:20-CV-1792 JCM (BNW)

8                        Plaintiff(s),                ORDER

9         v.

10   RYAN LEWIS, et al.,

11                      Defendant(s).

12

13        Presently before the court is defendant Clark County School District ("CCSD"), Ryan

14   Lewis, and Jorge Palacios (collectively, "defendants")'s motion for summary judgment. (ECF

15   No. 59).  Plaintiff Michelle Cox filed a response (ECF No. 66), to which defendants replied

16   (ECF No. 77).  Each filing was accompanied by a motion for leave to file excess pages. (ECF

17   Nos. 57; 64; 76).[1]

18   I.    Background

19        This is a complex case arising primarily from a bullying incident in a fifth-grade class.

20   Plaintiff brings claims on her own behalf and on behalf of her child, M.C.[2]  There is no genuine

21   dispute as to the following material facts.

22   . . .

23   . . .

24

25   ───────────────

26        [1] With good cause appearing, the court will GRANT each of these motions and consider
     the briefs as filed, in excess of this district's prescribed page limits.

27        [2] Plaintiff's response brief indicates that her child now uses the chosen name T.C. and
     he/him pronouns.  The court acknowledges that choice, but it is necessary to use the same name
28   that appears in all other filings for the sake of clarity of record because there has been no motion
     to amend the case caption.

James C. Mahan
U.S. District Judge

a.   The Bullying Incident

During the 2018–2019 school year, M.C. was a fifth-grade student at Edith Garehime Elementary School ("Garehime"), and plaintiff was also a teacher there.   (ECF No. 60 at 32) L.M., a new student, was placed in M.C.'s class at the beginning  of the school year alongside several students that M.C. already knew.  (*Id.*)

From the beginning, L.M. had some behavioral struggles.  *See* (*id.* at 33).  While the exact contours of the "outbursts" (as the parties characterize them) are unclear, the parties agree that there was no violence directed toward a student, and the outbursts consisted of being non-responsive to direction and knocking things over in the classroom.  (ECF Nos. 59 at 15; 65 at 3).

Following an incident in which L.M.'s father had to remove him from the classroom for being non-responsive, Mrs. Kress, the teacher, contacted Garehime administration and developed an evacuation plan wherein she could evacuate students from the classroom should L.M.'s behavior ever escalate into actual violence.  (ECF Nos. 60 at 34; 67 at 154).

Approximately a month later, on November 30, 2018, the students were transitioning between classrooms when L.M. had another outburst.  (ECF No. 60 at 67).  M.C. confronted him, and L.M. responded by making a veiled threat that he would kill someone who annoys him someday, someone like M.C.  (*Id.* at 67, 74, 78).  M.C. reported the statement to Mrs. Kress, who then filed a report to Garehime administration categorizing the behavior as a "threat to student." (*Id.* at 74).

Within a week of the report, defendant Palacios, the assistant principal who handles behavioral issues, interviewed L.M. and M.C. separately, and defendant Lewis spoke to other students in the classroom.  (*Id.* at 48, 78).  Following the investigation, Palacios brought both students to his office and had L.M. apologize.  (*Id.* at 68, 69).  According to defendants, M.C. reported being "okay" after the apology, *see* (ECF No. 60 at 78), but plaintiff contends that M.C. was deeply scared and upset following this meeting.  (ECF No. 68 at 62).  This pattern of M.C. downplaying the effect of the incident to school staff but reporting deep psychological symptoms and depression to plaintiff has continued since the incident.  *See* (ECF Nos. 60 at 49–50; 67 at 33).

Over the final month before the winter holiday, plaintiff and her husband discussed several options with school administration on how best to handle the follow-up to the incident. *See, e.g.*, (ECF No. 60 at 18–19). Eventually, all parties landed on a solution that would see M.C. move classes after the winter holiday. *See (id.)* But then, a few days before the end of the semester, plaintiff's husband (who had begun handling most of the communication with the school regarding the incident) sent Mr. Lewis, the head principal, an after-hours email requesting that the switch happen immediately. (*Id.* at 82).

The following day, plaintiff noticed M.C. still in Mrs. Kress's class. (*Id.* at 20). Plaintiff immediately went to the main office and asked to speak with Lewis. (*Id.* at 21). When Lewis entered the (public-facing) office, plaintiff began shouting at him asking him why he had not checked his email after hours, why he did not have his school email accessible on his phone, and demanding an explanation as to why M.C. was still in Mrs. Kress's class. (*Id.*; ECF No. 67 at 158–59). M.C. was switched into another fifth-grade class shortly thereafter, the school kept the two students apart, and the parties seemed pleased, for the time being. *See* (ECF No. 60 at 84).

Then, in sometime in the spring semester of 2019, M.C. and L.M. crossed paths again. During a testing day, M.C.'s new class was taking state tests in a computer lab, and M.C. had been opted out. (*Id.* at 52, 70). M.C. was given two choices—(1) remain in the lab while the class took the tests or (2) join Mrs. Kress's class for the day knowing L.M. would be in that room. (*Id.*) M.C. chose to be with Mrs. Kress's class. (*Id.*)

The next school year, M.C. moved to Leavitt Middle School ("Leavitt"). (*Id.* at 66). According to plaintiff, M.C. and L.M. initially shared a class while at Leavitt, but there is no evidence corroborating that claim. *See* (ECF No. 67 at 55). Throughout the fall, M.C. continued to experience mental health symptoms and reported anxiety and depression to plaintiff. (*Id.*) M.C.'s attendance was sporadic throughout the fall because of these symptoms and primarily consisted of attending orchestra class. (ECF No. 60 at 88).

At some point in the semester, CCSD notified plaintiff that M.C. qualified for a § 504 plan, which provides accommodations to qualifying students. (ECF No. 67 at 55). A § 504 plan

James C. Mahan
U.S. District Judge

- 3 -

was developed for M.C. in November 2019 and allowed for extra time to complete assignments, as well as additional support in the event of extended absences.  (ECF No. 60 at 86).

Plaintiff also asked that M.C. be granted the ability to officially attend school part-time in spring 2019 as needed.  (ECF No. 69 at 173–175).  Leavitt administrators responded that arrangements could be made for M.C. to attend only orchestra in-person so long as all other classes were taken in an online program like Nevada Learning Academy ("NVLA"); otherwise, M.C. would need to attend all classes at Leavitt.  (*Id.*)  Again, according to plaintiff this was a change from the administration's stance in fall of 2019, but there is no evidence to support that assertion.  (*Id.*)

Plaintiff chose to enroll M.C. in NVLA full-time.  (ECF No. 60 at 98).  After several months of failing to complete assignments in a timely manner, even with the extensions provided by the § 504 plan, NVLA determined that M.C. was not a "successful" student in its program and terminated M.C.'s enrollment.  (ECF No. 69 at 183).

b.  The Workplace Speech Incident

As mentioned above, in December 2018, plaintiff had a heated discussion with Lewis about Garehime's response to the bullying incident.  To recount, plaintiff's husband sent Lewis an after-hours email requesting that M.C. be placed in a new class.  (ECF No. 60 at 82).  Plaintiff saw M.C. in Mrs. Kress's class again the following day.  (*Id.* at 20).  Plaintiff then sought out Lewis in the school's office and confronted him about why he had moved M.C. out of the class or not checked his email after hours.  (*Id.* at 21; ECF No. 67 at 158–59).  Following this public confrontation, Lewis moved plaintiff into his private office to continue the conversation.  (ECF No. 67 at 159).  He told her to "watch her attitude," and the two went their separate ways.  (*Id.* at 167).

The next day, Lewis issued plaintiff a "notice of investigatory review," which is a required step before any discipline may be issued against a teacher pursuant to the collective bargaining agreement.  (ECF No. 60 at 100, 103–04).  The two met pursuant to that notice in January 2019, and it was determined that no discipline was warranted for the incident.  *See* (ECF No. 67 at 42–43).

James C. Mahan
U.S. District Judge

- 4 -

Later, in a standard end-of-the-year evaluation, plaintiff received a "area of growth" comment that she should model "integrity" in her interactions with her colleagues and superiors from Palacios (and approved by Lewis).   (ECF No. 60 at 120, 122).   Areas of growth are not formal disciplinary actions.  (*Id.* at 53).

Plaintiff then contacted CCSD administrators to complain about the evaluation.  *See, e.g.*, (ECF No. 69 at 133).   She was directed to the teacher's union pursuant to the collective bargaining agreement negotiated with CCSD.  *See* (*id.* at 69).   She then filed a grievance regarding the evaluation but withdrew it shortly thereafter.  (ECF No. 60 at 124, 126).

c.   The FMLA Incident

In the spring 2019 semester, while the fallout of the initial bullying incident and the aftermath of the workplace speech confrontation were ongoing, plaintiff requested and was approved for FMLA leave to care for M.C., who was continuing to experience bouts of worsening depression and anxiety, amongst other symptoms.  (ECF No. 69 at 185–91).  Plaintiff was approved for intermittent leave between May and November 2019.  (*Id.*)

At the beginning of the 2019 school year, plaintiff transferred to Wynn Elementary School ("Wynn").   (ECF No. 67 at 16).   From August to October 2019, plaintiff used her approved leave on several occasions, with the longest stretch of leave being three consecutive days.  (ECF No. 60 at 134).

Wynn required teachers to notify their supervisor and office manager of any absences. (ECF No. 69 at 197).  Wynn also had a policy that all lesson plans were to be completed a week in advance of the instructional day.  (*Id.* at 200).  To that end, if a teacher was absent, the office manager would request lesson plans to provide the substitute teacher.  (ECF No. 70 at 12).

On October 2, 2019, the third day of an approved period of block leave, plaintiff resigned her position as a teacher at Wynn.   (ECF No. 60 at 162).   According to plaintiff, she resigned because the stress of having to provide lesson plans was too great.  (ECF No. 67 at 46–47).

d.   Procedural History

As a result of all this, plaintiff brought the instant suit on her own behalf and on behalf of her child.  She brings claims for (1) retaliation in violation of the First Amendment as it relates to

the workplace speech incident and the resulting evaluation comments, (2) FMLA interference related her work at Wynn, (3) violation of § 504 of the Rehabilitation Act and Title II of the ADA as it relates to CCSD's treatment of M.C. in the 2019 school year, (4) negligence related to the original bullying incident and the investigation, and (5) intentional infliction of emotional distress also related to the bullying incident/investigation.  The court originally dismissed plaintiff's first three claims before plaintiff filed an amended complaint.  (ECF Nos. 22; 34).  Defendants now move for summary judgment on all claims.  (ECF No. 59).

**II.     Legal Standard**

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party.  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).  However, to be entitled to a denial of summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.*

In determining summary judgment, the court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  Moreover, "[i]n such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *Id.*

By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's

**James C. Mahan**
**U.S. District Judge**

- 6 -

case on which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether a genuine dispute exists for trial.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.  *See id.* at 249–50.

The Ninth Circuit has held that information contained in an inadmissible form may still be considered for summary judgment if the information itself would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")).

**III.    Discussion**

As noted above, this matter is complex.  There are truly three distinct cases that arise out of the same underlying facts.  First, there are the tort-based claims surrounding M.C.'s experience with the bullying incident and the subsequent investigation.  Second, there is the educational accommodation claim that arises out of the school's purported failure to properly accommodate M.C.'s needs.  Finally, there are two distinct employment law claims related to plaintiff that, while arising out of the underlying bullying incident, require wholly separate analysis.  As the court will discuss below, there is no genuine dispute of material fact as to any claim, and defendant's motion for summary judgment is GRANTED on all claims.

a.    First Amendment Retaliation

i.    *Lewis and Palacios*

When a plaintiff asserts a § 1983 cause of action against government officials in their individual capacity, the government official may raise the affirmative defense of qualified immunity.  *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir.2005).  Here, the defendants have asserted this defense.

Qualified immunity insulates public officials "'from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is broad, protecting "'all but the plainly incompetent or those who knowingly violate the law.'"  *Lee v. Gregory*, 363 F.3d 931, 934 (9th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Determining whether a defendant is entitled to qualified immunity in a § 1983 action entails a two-part, conjunctive analysis exercised in the order the court deems appropriate.  First, a court must consider whether the defendant's actions violated a constitutional right.  *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009).  In making this inquiry, the court views facts in the light most favorable to the party asserting the injury.  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

**James C. Mahan**
**U.S. District Judge**

Second, the court must determine whether the constitutional right was clearly established. *Conn*, 572 F.3d at 1062.  A right is clearly established if "'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'"  *Id.* at 1062 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  In making this inquiry, the court should consider "the specific context of the case" and not "broad general proposition[s]."  *Saucier*, 533 U.S. at 201.  It is the plaintiff's burden to show that the constitutional right was clearly established. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  "[T]he law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity.'"  *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998) (quoting *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998)).

In *Pickering*, the Supreme Court set out a framework to determine whether and to what extent an employer may regulate the speech of its employees in the workplace.  Specifically, the court held that there must be a "balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563, 568 (1968).

"The question whether a public employee or contractor 'enjoyed a clearly established right to speak' depends on 'whether the outcome of the *Pickering* balance so clearly favored [the plaintiff] that it would have been patently unreasonable for the [government] to conclude that the First Amendment did not protect [her] speech."  *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 729 (9th Cir. 2022) (quoting *Brewster*, 149 F.3d at 980).

Plaintiff here has not shown that there was a clearly established constitutional right at the appropriate level of specificity, and thus, the individual defendants are entitled to qualified immunity.  While it is beyond question that retaliation based on protected speech is unlawful, "[t]he right to be free from First Amendment retaliation cannot be framed as 'the general right to be free from retaliation for one's speech'" in the context of a qualified immunity inquiry.  *Riley's Am. Heritage Farms*, 32 F.4th at 729 (quoting *Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

James C. Mahan
U.S. District Judge

- 9 -

1    Plaintiff frames the issue as hinging on whether a "reasonable official would have known

2    that taking employment action designed to penalize an employee for, and discourage her from,

3    speaking out as a parent on matters of student safety violated her First Amendment rights."

4    (ECF No. 65 at 31).  While this is, to an extent, a correct statement of law, the actual issue is not

5    so simple.

6    Plaintiff was both a parent and an employee.  Further, her relevant speech dealt with two

7    separate issues: (1) removal of her child from the class and (2) Lewis's failure to check his email

8    after work hours.  Given those complications, this scenario is not as simple as she frames it.

9    As this court has previously discussed in its denial of the motion to dismiss, bullying

10   policy is a matter of public concern—in the abstract.  The Ninth Circuit has held the same, but

11   only in the context of an individual speaking about school bullying policies broadly.  *See Posey*

12   *v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1124, 1130 (9th Cir. 2008).  Here, to the

13   extent that plaintiff's speech dealt with bullying, it was referring to the specific incidents her

14   child experienced.  She was not speaking about the school's bullying policy as a whole; she was

15   specifically asking about why her concerns about her child had not been addressed.  So, while it

16   might be clearly established that speech regarding the school's overall bullying policies is

17   protected, that is not what occurred here.  Plaintiff was inquiring about a specific instance of

18   bullying involving her child, and she did so seemingly without reference to the school's overall

19   treatment of bullying as occurred in *Posey*.

20   And even further, the fact that plaintiff spent time publicly addressing Lewis's email

21   habits—indeed, seemingly more time—weighs in favor of qualified immunity.  Speech regarding

22   a superior's responsiveness delivered with the intent to reach only that supervisor is exactly the

23   sort of "workplace grievance" found unworthy of protection.  *See Havekost v. U.S. Dept. of*

24   *Navy*, 925 F.2d 316, 318–19 (9th Cir. 1991).

25   Thus, the *Pickering* test does not clearly favor plaintiff.  Given the ambiguities of the

26   scope of the speech—(1) referencing her child specifically as opposed to the bullying policy and

27   (2) her workplace-adjacent comments about Lewis's responsiveness—Lewis and Palacios could

28   have reasonably believed, under the specific facts of this case, that the speech was not protected.

James C. Mahan
U.S. District Judge

1    They are thus entitled to qualified immunity, and summary judgment is GRANTED in their

2    favor on the First Amendment retaliation claim.

3              *ii.   CCSD*

4          Plaintiff also brings this claim against CCSD under a *Monell* theory of liability.   Under

5    *Monell*, a municipality is liable for constitutional torts that its employees commit pursuant to a

6    municipal policy.   *Monell v. Dep't of Social Services*, 436 U.S. 658, 698 (1978).   To prevail on a

7    *Monell* claim, a plaintiff must show (1) the plaintiff was deprived of a constitutional right; (2) the

8    defendant had a policy or custom; (3) the policy or custom amounted to deliberate indifference to

9    the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the

10   constitutional violation.   *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

11         The Ninth Circuit has held that a plaintiff can establish a municipal policy by

12   demonstrating one of the following:

> (1) the constitutional tort was the result of a longstanding practice or custom
> which constitutes the standard operating procedure of the local government entity;
> (2) the tortfeasor was an official whose acts fairly represent official policy such
> that the challenged action constituted official policy; or (3) an official with final
> policy-making authority delegated that authority to, or ratified the decision of, a
> subordinate.

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quotation marks and citations omitted).

      Here, plaintiff fails to establish a municipal policy because there was no final

policymaker involved in plaintiff's discipline.   The Second Circuit has persuasively concluded

that there is a difference between a final "decisionmaker" and final "policymaker."   *See Agosto*

*v. New York City Dep't of Educ.,* 982 F.3d 86, 100–101 (2d Cir. 2020).   That conclusion is an

echo of a Ninth Circuit decision reaching materially the same conclusion.   *See Collins v. City of*

*San Diego*, 841 F.2d 373, 341 (9th Cir. 1988)

       Determining any one decision represents the final "policy" of an entity risks collapsing

*Monell* liability into simple *respondeat superior* liability, which the Supreme Court has explicitly

cautioned against.   *See Board of Cnty. Comm. of Bryan City v. Brown*, 520 U.S. 397, 405, 410

(1997) ("To prevent municipal liability . . . from collapsing into respondeat superior liability,"

federal courts must apply "rigorous standards of culpability and causation" in order to "ensure

that the municipality is not held liable solely for the actions of its employees.").

**James C. Mahan**
**U.S. District Judge**

1    To be sure, the Supreme Court has found that a single decision by a final policymaker

2    can give rise to *Monell* liability in some circumstances.  *See Bd. Of Cty. Comm'rs of Bryan City,*

3    *Okl. v. Brown*, 520 U.S. 397 405–06 (1997).  However, merely exercising discretion does not

4    invite liability unless the actor is "responsible for establishing final government policy" on the

5    issue.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986).  What person or entity

6    holds final policymaking authority is a question of state law.  *Id.* at 483.

7    In Nevada, state law imbues a board of trustees in each county's school district with final

8    authority over school-related decisions.  *See* Nev. Rev. Stat. 386.110; 386.350.  Further, teachers

9    in Clark County are unionized and subject to a collective bargaining agreement governing the

10   terms of their employment, including the disciplinary process.  *Id.* at 288.150.  Thus, the

11   collective bargaining agreement constitutes the final "policy" regarding employee discipline of

12   CCSD teachers.  Neither Lewis nor Palacios had authority to alter that agreement.

13   Moreover, the collective bargaining agreement contains an appeal process.  *See* (ECF No.

14   60 at Ex. T).  Plaintiff began this process before withdrawing her grievance.  (*Id.* at Exs. X, Y).

15   The fact that she could obtain a ruling overturning any discipline severely undercuts her

16   argument that any of the discipline she experienced was "final" or that the decision was ratified

17   by someone with final authority.

18   Ratification of a subordinate's decision requires more than simple acquiescence.  *See*

19   *Sheehan v. City & Cnty. of San Francisco*, 741 F.3d 1211, 1231 (9th Cir. 2014).  The final

20   policymaker ratifying the decision must make a deliberate choice amongst various options to

21   specifically approve of the subordinate's decision.  *Gillette v. Delmore*, 979 F.2d 1342, 1346–47

22   (9th Cir. 1992).

23   Here, there is no record of a final policymaker even considering, much less affirmatively

24   endorsing the disciplinary actions of which plaintiff complains.  Merely acquiescing to the

25   decisions Lewis and Palacios made is not the sort of ratification the Ninth Circuit's precedent

26   contemplates.

27   Considering all this, plaintiff fails to establish a policy under any of the three possible

28   theories.  There is no formal policy in place, neither Lewis nor Palacios are the final

James C. Mahan
U.S. District Judge

1   policymakers on teacher discipline as a matter of state law, and there was no ratification because

2   the final policymaker, at most, acquiesced to the decision.  She thus cannot maintain a *Monell*

3   claim against CCSD, and summary judgment is GRANTED against her First Amendment

4   retaliation claim in its entirety.

5           b.  FMLA Claim

6           Plaintiff's second claim alleges that CCSD interfered with her FMLA leave.  "To make

7   out a prima facie case of FMLA interference, an employee must establish that (1) he was eligible

8   for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to

9   leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his

10  employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry*

11  *Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (citation and internal quotation marks omitted).

12          To prevail on an FMLA interference claim, a plaintiff "need only prove by a

13  preponderance of the evidence that her taking of FMLA-protected leaves constituted a negative

14  factor in [an adverse employment decision]." *Bachelder v. American West Airlines*, Inc., 259

15  F.3d 1112, 1125 (9th Cir. 2001).  The FMLA's implementing regulations state that notice must

16  be given at least 30 days in advance if the need for the leave is foreseeable, or "as soon as

17  practicable" otherwise.   29 C.F.R. § 825.302(a).   Even if an employer "interfer[es] with,

18  restrain[s], or den[ies] [an employee's] exercise of FMLA rights," the FMLA "provides no relief

19  unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide*,

20  *Inc.*, 535 U.S. 81, 89 (2002).

21          Interference also includes requiring an employee to do work while on FMLA leave.  *See*

22  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 (9th Cir. 2003).  Courts in other circuits, as well

23  as other district courts in this circuit, have determined that certain *de minimis* contacts such as

24  requests for documentation, inquiries about when the employee will return, and telephone calls

25  do not constitute interference. *See O'Donnell v. Passport Health Commc'ns, Inc.,* 561 F. App'x

26  212, 218 (3d Cir. 2014); *Sabourin v. Univ. of Utah*, 676 F.3d 950, 961 (10th Cir. 2012); *Clark v.*

27  *AmTrust N. Am.*, No. 16-CV-05561-MEJ, 2018 WL 839148, at *17 (N.D. Cal. Feb. 13, 2018).

28  The ultimate question is "whether an employee was required to perform or produce work" while

James C. Mahan
U.S. District Judge

1    on leave. *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1158–59 (8th

2    Cir. 2016).[3]

3            There is no evidence here that plaintiff was required to perform work while on leave.

4    Wynn Elementary requires that all lesson plans be completed one week in advance of the

5    instruction. *See* (ECF No. 69 at 226). Plaintiff's FMLA leave was intermittent, and only one

6    block of leave time extended beyond one week. *See* (ECF No. 60 at 134). Notably, that

7    extended leave was from September 30, 2019, to October 24, 2019, and plaintiff resigned her

8    employment effective October 2, 2019—three days into this leave period. *See* (*id.* at 134, 162).

9    Thus, under the school's policy, she would have already had lesson plans prepared for all

10   absences.

11           Indeed, Wynn's principal confirmed in her deposition that while teachers taking FMLA

12   leave may be asked for lesson plans that have already been completed, any teacher taking an

13   extended period of leave would not have to send in plans that had not yet been completed. (ECF

14   No. 69 at 197). Likewise, an assistant principal confirms that those previously filed lesson plans

15   would be provided to substitutes, but that often "teachers *like* to provide an alternative activity

16   that's easier for [substitutes] to facilitate with kids." (ECF No. 69 at 226) (emphasis added).[4]

17

18

19           [3] Plaintiff's response contains a block quote purportedly from this case reading, in
20   relevant part: "Courts have generally held that, where there is a material dispute of fact about
     whether an employee was required to perform or produce work, summary judgment should be
21   denied." (ECF No. 65 at 27). This language appears nowhere in that opinion, and, as far as the
     court can tell, nowhere in any other opinion available on Westlaw. *See Massey-Diez*, 826 F.3d at
22   1158–59. The purported quote is not the Eighth Circuit's language, which instead includes a
     lengthy string cite comparing several cases. While it nevertheless appears to be an accurate
23   summary of the law, counsel is still admonished for misleading the court and is reminded of the
     duty of candor imposed on all attorneys in Nevada.

24           [4] Plaintiff attempts to distinguish the lesson plans she was required to prepare a week in
25   advance from the plans she was required to provide a substitute teacher if she was absent by
     citing to two pieces of deposition testimony given by one of Wynn's assistant principals and
26   Wynn's office manager. Neither of those depositions supports that there was a requirement of
     separate plans for substitutes. To be sure, the assistant principal's testimony indicates that some
27   teachers "like to provide an alternative activity," but she explicitly notes that substitutes would
     have been provided with the previously filed lesson plans. (ECF No. 69 at 226). Likewise, the
28   office manager's testimony shows that she simply asked for substitute plans. (ECF No. 70 at
     12). That plaintiff then chose to provide an alternative set of plans rather than refer the office
     manager to the filed plans does not invite liability.

Plaintiff provides no evidence that she was ever asked specifically to *prepare* a separate lesson plan while on leave, only that she was asked to *provide* them.  *See* (ECF No. 60 at Ex. FF).  While semantic, that distinction is critical.  No one at the school required that plaintiff do the work of preparing the lesson plans themselves while she was on leave—those plans should have already been prepared the week prior to any given leave. That plaintiff may have been non-compliant with the one-week-in-advance policy does not invite liability on the school's part.

The only evidence she provides wherein she is explicitly asked to provide lesson plans are two emails dated September 4, 2019, and September 10, 2019, respectively.  (*Id.* at 146, 151).  Plaintiff did not use FMLA leave for her absence on September 4, and the September 10 date is at the end of a 1.5-day period of leave.  (*Id.* at 134).  By the letter of Wynn Elementary policy, plaintiff should have had her lesson plans for September 10, 2019, completed by September 3, 2019, such that the email on September 10 would have required nothing more than passing along the documents.

Thus, those contacts are the sort of *de minimis* contacts other circuits have contemplated as outside the scope of interference.  This instant case is more akin to a professor being asked to provide a previously completed spreadsheet, *see Sabourin,* 676 F.3d at 961, than an employe being asked to update case files and conduct a safety review, *see Smith-Schrenk v. Genon Energy Servs., L.L.C.,* No. CIV.A. H-13-2902, 2015 WL 150727, at *10 (S.D. Tex. Jan. 12, 2015).

Even setting all of that aside, plaintiff fails to provide any evidence that she actually prepared plans while on leave.  She does not provide the plans that she was supposedly required to prepare, nor does she even indicate when she created them or how much of her leave she spent working.

Viewing the totality of the evidence in the light most favorable to plaintiff, there was no interference with her FMLA leave.  Plaintiff received the FMLA leave that she requested and elected to resign.  She was asked to pass along documents that should have been previously prepared in compliance with school policy.  There is no genuine dispute of material fact and summary judgment is appropriate.  Defendants' motion is GRANTED as to the FMLA claim.

. . .

James C. Mahan
U.S. District Judge

1

   c.   ADA/§ 504 Claim

2      During the pendency of this motion, the Supreme Court heard argument in *Luna Perez v.*

3  *Sturgis Publ. Sch.*, 143 S.Ct. 859 (2023) and issued its opinion on March 21, 2023.  The Court

4  held that the IDEA's exhaustion requirement is not applicable to suits brought under § 504 for

5  compensatory damages since compensatory damages are not an available remedy under the

6  IDEA's regime.  *Id.* at 865.  As plaintiff's claim is a backwards-looking claim for compensatory

7  damages, the Court's holding applies, and exhaustion is not required.[5]

8      Section 504 of the Rehabilitation Act forbids organizations that receive federal funding,

9  including public schools, from discriminating against people with disabilities.   29 U.S.C.

10  § 794(B)(2)(B); *Bird v. Lewis & Clark Coll.,* 303 F.3d 1015, 1020 (9th Cir.2002).  Section 504

11  provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her

12  or his disability, be excluded from the participation in, be denied the benefits of, or be subjected

13  to discrimination under any program or activity receiving Federal financial assistance."   29

14  U.S.C. § 794(a).   An organization that receives federal funds violates § 504 if it denies a

15  qualified individual with a disability a reasonable accommodation that the individual needs in

16  order to enjoy meaningful access to the benefits of public services.  *See Alexander v. Choate,*

17  469 U.S. 287, 301–02 & n. 21 (1985); *Bird,* 303 F.3d at 1020, 1022.  Title II of the Americans

18  with Disabilities Act extends these protections to prohibit discrimination by all public entities,

19  not just those receiving federal financial assistance.  *See* 42 U .S.C. §§ 12132–12133.

20      To establish a claim for monetary damages under the ADA and Rehabilitation Act,

21  plaintiffs must prove intentional discrimination.  *See Ferguson v. City of Phoenix,* 157 F.3d 668,

22  674 (9th Cir.1998) (ADA); *Duvall v. Kitsap,* 260 F.3d 1124, 1135 (9th Cir.2001) (Rehabilitation

23  Act).  The level of intent required to support an award of compensatory damages is measured by

24  the "deliberate indifference test."  *Lovell v. Chandler,* 303 F.3d 1039, 1056 (9th Cir.2002).

25

26

27      [5] Plaintiff specifically requests compensatory damages "and further relief as justice
28  requires."  Because plaintiff does not specifically request any sort of equitable relief related to
   this claim, the court will consider it a claim for damages so that the claim can be considered on
   the merits.

**James C. Mahan**
**U.S. District Judge**

1    "Deliberate indifference requires both knowledge that a harm to a federally protected

2    right is substantially likely, and a failure to act upon that likelihood." *Duvall* 260 F.3d at 1139

3    (*citing City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).   The first element is satisfied when

4    the public entity has notice that an accommodation is required.   *Id.*   The second element is

5    satisfied if the entity's "failure to act [is] a result of conduct that is more than negligent, and

6    involves an element of deliberateness." *Id.*   Under the second element, "a public entity does not

7    'act' by proffering just any accommodation; it must consider the particular individual's need

8    when conducting its investigation into what accommodations are reasonable." *Id.*   Where a

9    plaintiff cannot show deliberate indifference, summary judgment is appropriate. *Doe v. Nevada,*

10   2006 WL 2583746, (D.Nev.2006).

11   Here, the parties do not dispute the CCSD conducted an investigation and developed a

12   § 504 plan for M.C. in November 2019.   *See* (ECF No. 69 at Ex. 15).   Plaintiff argues,

13   essentially, that the § 504 plan wound up not being enough.   That is not deliberate indifference.

14   She asserts three grounds for CCSD's liability: (1) it "intentionally placed" M.C. with

15   L.M. after the incident in question; (2) it did not allow M.C. to undertake a part-time in-person

16   schedule; and (3) it did not grant M.C. additional time to complete assignments.   The court will

17   address each in turn.

18   As to the first ground, there is no evidence in the record to support the contention that

19   CCSD intentionally placed the two students together.   There is specific evidence of a single

20   instance of M.C. and L.M. being together after the original bullying incident.[6]   (ECF No. 60 at

21   52, 70).   In that instance, M.C. *chose* to be in the same room as L.M..

22   A school is not deliberately indifferent when it offers a student a choice and the student

23   picks one of the options.   Indeed, the record shows that M.C. was given the opportunity to spend

24   the day in a classroom that would have afforded total separation from L.M. and made a

25   conscious choice not to.   (*Id.*)   If anything, the school made the deliberate choice to offer a

26

27   [6] Plaintiff's response and deposition also reference an incident the following year in

28   which the two students were allegedly in the same class for at least a day once they had moved to
Leavitt Middle School.   *See* (ECF No. 65 at 12).   Plaintiff cites to no other evidence of this event
in the record, and there are no allegations in the complaint related to it, so the court will not
consider that alleged incident as part of the claim.

James C. Mahan
U.S. District Judge

- 17 -

1   solution ensuring that the two would be separated.  Plaintiff cannot now hold the school liable

2   for the choice her child made when presented with two options.

3        The third ground regarding additional time for assignments is also belied by the evidence.

4   M.C.'s § 504 plan specifically allows for additional time to complete assignments—48 additional

5   hours.  (ECF No. 69 at 177).  It is unclear to the court how a school district is deliberately

6   indifferent for following the § 504 plan developed for this particular student.

7        Plaintiff asserts that defendant failed to act on "repeated notices" that her child "required

8   more time" to complete assignments after the transition to NVLA following development of the

9   § 504 plan, and she cites to a series of emails for that proposition.  (ECF No. 65 at 40) (citing

10  Exs. 16–17).  Nowhere in those emails is there a request for modification of the § 504 plan or

11  even an indication that the current plan might be insufficient.  Those emails contain notifications

12  that plaintiff had been seeking additional therapy for her child, but nothing more specific than

13  that.  There is nothing in the cited evidence showing plaintiff "alerted the public entity to [the]

14  need for accommodation," nor is there anything in the emails even implying there was a need for

15  further accommodation beyond what had already been granted in the § 504 plan.  *See Duvall*,

16  260 F.3d at 1139.

17       Plaintiff seems to think that defendant has some sort of duty to read between the lines of

18  her vague emails to determine that her child required further accommodation.  It is well settled

19  that a fact-finding, investigative duty exists once the entity is on notice of the potential

20  discrimination.  *See, e.g.*, *Wong v. Regents of Univ. of California*, 192 F.3d 807, 818 (9th Cir.

21  1999), *as amended* (Nov. 19, 1999).  But here, that duty had not been triggered yet because there

22  is no indication that defendant had notice of a need for further accommodations.  The school is

23  thus not deliberately indifferent because it had no notice that further accommodation (beyond

24  what had already been provided) was necessary.

25       Turning to the final ground, plaintiff argues that defendant is liable because it failed to

26  offer her child a part-time schedule for the spring 2020 semester.  The court is puzzled by this

27  accusation because it is also belied by the record.

28

James C. Mahan
U.S. District Judge

1    The school offered a part-time schedule in which her child could attend orchestra in-

2    person and complete all remaining coursework online. *See* (ECF No. 60 at Ex. Q); (ECF No. 69

3    at 173). So, when plaintiff contends that she was blindsided by the binary choice of her child

4    having "a full-time schedule in person, or fully at home or online," she misrepresents the

5    available evidence. *See* (ECF No. 65 at 37). Her child could certainly attend fully in-person or

6    fully online, but the school also offered the third, hybrid choice of attending orchestra in addition

7    to the online/remote instruction.

8    Plaintiff asserts that this was an arbitrary change as her child had been allowed to attend

9    school in-person part time in the fall of 2019. First, there is no evidence that the attendance

10   record in fall 2019 had been formally approved by the school at all. Second, the § 504 plan was

11   not developed until November 2019 regardless. Following development of the § 504 plan,

12   defendant laid out several attendance options for plaintiff's child, as discussed above.

13   Here, defendant provided a reasonable accommodation that did not require it to

14   fundamentally modify its standards—namely, its attendance protocol. Plaintiff's child was

15   offered the opportunity to enroll full-time in another online school—NVLA—and then attend

16   orchestra in-person at Leavitt. The court fails to see how this was not a reasonable

17   accommodation as the concern centered on the fact that M.C. could not attend a full day of in-

18   person learning at school. Defendant "was not required to grant the specific accommodation

19   requested by [plaintiff] or otherwise make substantial modifications to the programs that were

20   used for all other students." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282 (3d Cir. 2012).

21   Plaintiff's requested accommodation was, essentially, that her child be allowed to attend

22   classes on an ad-hoc, partial basis for the spring 2020 semester. According to her, the fact that

23   the school did not agree to this schedule was functionally the denial of "any in person education

24   —a benefit offered to every other student." (ECF No. 65 at 37). Not so.

25   As discussed above, defendant did not exclude the student from in-person education—a

26   partial schedule allowing orchestra in-person was left on the table. It is thus unclear to the court

27   what the precise complaint is. Plaintiff was offered three choices for scheduling, including a

28

**James C. Mahan**
**U.S. District Judge**

1    hybrid schedule option that addressed her child's needs.  That she and her child chose not to

2    avail themselves of that option does not impart liability to defendant.

3           It is part and parcel of a public education that a student is required to attend certain

4    "core" classes.  *See, e.g.*, Nev. Rev. Stat. 389 *et seq.* (defining Nevada's minimum curricular

5    requirements).  Thus, it is not reasonable accommodation to request that a student receive *carte*

6    *blanche* to attend only some classes and to do so without any true boundaries to define the

7    attendance parameters.

8           The court is not in the business of questioning plaintiff's assessment of her child's needs

9    and is sympathetic to M.C.'s inability to attend a full day of in-person instruction.  But the court

10   can nonetheless say that defendant's response was a reasonable accommodation.  Defendant is

11   required to accommodate M.C.'s needs, not acquiesce to plaintiff's demands.  It provided an

12   accommodation that was reasonable and did not lower its educational standards.  *See SE Comm.*

13   *College v.* Davis, 442 U.S. 397, 413 (1979).  There is no liability under this third theory and

14   defendants' motion for summary judgment is GRANTED as to the ADA/§ 504 claim.

15           d.   Intentional Infliction of Emotional Distress Claim

16          Plaintiff also brings claims for intentional infliction of emotional distress claim and

17   negligence against Lewis and Palacios related to the aftermath of the original bullying incident.

18   However, plaintiff has failed to perfect a waiver of Nevada's sovereign immunity, and summary

19   judgment is appropriate on these claims.

20          The Eleventh Amendment to the United States Constitution preserves state sovereign

21   immunity and prevents private citizens from asserting claims against states, their agencies, or

22   employees.  *Jachetta v. United States*, 653 F.3d 898, 908 (9th Cir. 2011).  However, this

23   immunity is not absolute.  A private citizen may assert a claim against a state when the federal

24   government has abrogated sovereign immunity or when the state has waived it.  *Coll. Sav. Bank.*

25   *v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S 666, 670 (1999).

26          A state waives sovereign immunity when consent to suit is "unequivocally expressed in

27   statutory text."  *Holley v. California Dept. of Corrections*, 599 F.3d 1108, 1111 (9th Cir. 2010)

28   (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  The State of Nevada has unequivocally waived

James C. Mahan
U.S. District Judge

- 20 -

its sovereign immunity under NRS 41.031 subject to certain limitations. Nev. Rev. Stat. 41.031. However, it has explicitly declined to waive "immunity from suit conferred by Amendment XI of the Constitution of the United States." *Id.* at 41.031(3).

Nevada law provides that no tort claims may be brought against a state employee for actions arising out of that employee's duties unless the appropriate political subdivision that employees works for is also named as a defendant. Nev. Rev. Stat. 41.0337. Courts in Nevada have determined that this statute applies on a per claim basis—that is, each relevant claim must name the subdivision, and cannot rely on just the lawsuit as a whole. *See Craig v. Donnelly*, 439 P.3d 413, 416 (Nev. App. 2019).

Nevada and its agencies typically cannot be sued in federal court. *See O'Connor v. State of Nev.*, 686 F.2d 749, 750 (9th Cir. 1982). A state agency like CCSD may consent to federal court jurisdiction by removing a case from state court, but this case was not removed. *See Perez v. State of Nevada*, 2:15-cv-01572-APG-CWH, 2016 WL 4744134, at *4 (D. Nev. Sept. 12, 2016)*; Weidner v. Nevada,* 2:16-cv-02301-KJD-NJK, 2017 WL 5985563, at *2 (D. Nev. Nov. 30, 2017). Likewise, even if the court might otherwise have supplemental jurisdiction over certain state law claims, 28 U.S.C. § 1397 does not abrogate state sovereign immunity alone. *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133–34 (9th Cir. 2006). Thus, "[w]hen the State of Nevada is an indispensable party (such as under NRS 41.0337), the federal court does not have supplemental jurisdiction over the state law tort claim because it does not have jurisdiction over the indispensable party—the State." *Entsminger v. Aranas*, No. 3:16-CV-00555-MMD-WGC, 2020 WL 3106208, at *2 (D. Nev. May 13, 2020), (report and recommendation adopted, 2020 WL 3103898 (D. Nev. June 11, 2020)).

By the letter of Nevada law, CCSD (as the political subdivision) is an indispensable party, and it must be named in any claim that is brought against one of its employees. Plaintiff's IIED claim fails to name CCSD; therefore it must fail.

Plaintiff asserts that defendants must be judicially estopped from taking this position because they have each vehemently argued that a § 1983 claim against Lewis and Palacios in

James C. Mahan
U.S. District Judge

- 21 -

1   their official capacities is the equivalent of a claim against CCSD.  Plaintiff misapprehends the

2   differences between a federal § 1983 claim and a state tort claim.

3   It is a matter of black-letter law that a federal § 1983 claim brought against individuals in

4   their official capacity is treated the same as a § 1983 claim against the government entity

5   employing that individual.  *See Larez v. Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).  The

6   same is not true of a state law tort claim which does not distinguish between individual and

7   official capacity.  Were the court to accept plaintiff's position, NRS 41.0337 would be a dead

8   letter.  Why would Nevada law explicitly require the naming of a political subdivision if a claim

9   against an employee was the functional equivalent?

10   Plaintiff is correct that, in some circumstances, a claim against an individual and a claim

11   against the entity are identical—but that is not the case here.  Defendants have previously argued

12   (successfully) that the § 1983 claim against Lewis and Palacios in their official capacities should

13   be treated as a claim against CCSD.  They have never taken that position as to the wholly

14   separate state law claims at issue now.  The court therefore sees no reason that they should be

15   estopped from taking a position that is correct as a matter of law on a wholly separate claim.

16   In the alternative, plaintiff requests leave to amend to name CCSD in this claim so that it

17   might survive.  Although Federal Rule of Civil Procedure 15 counsels that leave to amend should

18   be granted liberally, the court finds it inappropriate in this circumstance.  Plaintiff has already

19   been given the opportunity to amend and did not include CCSD in this claim, despite naming it

20   in the other state law claim for negligence.  Plaintiff intentionally omitted CCSD from this claim

21   for reasons unknown to the court, and she should not now be given a second chance in the face

22   of an adverse summary judgment motion.  Thus, summary judgment is granted to defendants on

23   plaintiff's IIED claim.

24   e.   Negligence Claim

25   Plaintiff also brings a negligence claim against all defendants.  Because CCSD was

26   named specifically in this claim, the court need not address the NRS 41.0337 issue discussed

27   *supra*.

28

**James C. Mahan**
**U.S. District Judge**

1    Plaintiff suggests six avenues for liability: (1) assignment of a "dangerous student" to

2    M.C.'s class, (2) failure to protect M.C. from L.M., (3) failing to address the bullying incident,

3    (4) failing to investigate L.M.'s threats, (5) forcing M.C. to listen to a "forced apology," and (6)

4    cultivating an environment that allowed bullying to flourish.  All of these fail—either because

5    defendants enjoy discretionary-function immunity or because plaintiff's claims fail on the merits.

6    Discretionary-function immunity provides that a plaintiff cannot bring an action against

7    the state "[b]ased upon the exercise or performance or the failure to exercise or perform a

8    discretionary function . . ."[7]  Nev. Rev. Stat. 41.032(2).  For an act to constitute a discretionary

9    function, it must "(1) involve an element of individual judgment or choice and (2) be based on

10   considerations of social, economic, or political policy."  *Martinez v. Maruszczak*, 168 P.3d 720,

11   729 (Nev. 2007).  Any government decision, including those that are frequent and routine, may

12   fall within the scope of discretionary-function immunity.  *Ransdell v. Clark Cnty.*, 192 P.3d 756,

13   855 (Nev. 2008).

14   While all six of plaintiff's theories involve an element of individual judgment (satisfying

15   prong one), only some are based on the policy choices required of the second prong.  Namely,

16   the first and second theories (dealing with assigning L.M. to the class and the alleged failure to

17   reasonably protect M.C. from L.M.), as well as the sixth (cultivating an environment that fosters

18   bullying) are based on policy choices and thus precluded.

19   Discretionary-function immunity is designed to prevent judges from "second guessing"

20   any "legislative and administrative decisions grounded in social, economic, and political policy."

21   *Clark Cnty. Sch. Dist. v. Payo*, 403 P.3d 1270, 1276 (Nev. 2017) (quoting *Martinez*, 168 P.3d at

22   729 and *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).  The Nevada Supreme Court

23   has approvingly cited reasoning from other state courts that "executive or planning function[s],

24   'characterized by the exercise of a high degree of official judgment or discretion'" are more

25

26   [7] On its face, NRS 41.032(2) does not immunize municipal governments or their employees
     because municipalities are considered independent corporations or "persons" with their own

27   identities, not mere political subdivisions of a state.  See *Monell*, 436 U.S. at 690.  The Nevada
     Supreme Court, however, has implicitly assumed that municipalities are political subdivisions of

28   the state for the purposes of applying discretionary-function immunity.  See, e.g., *Travelers
     Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354–55 (Nev. 1987).

James C. Mahan
U.S. District Judge

1   likely to be the type of policy considerations that satisfy the second prong.  *Id.* at 633 (quoting

2   *Gonzalez v. Univ. Sys. of New Hampshire*, No. 451217, 2005 WL 530806, at *17 (Conn. Super.

3   Ct. Jan. 28, 2005) and *Mahan v. N.H. Dep't of Admin. Servs.*, 693 A.2d 79, 82 (N.H. 1997)).

4       As to these three specific theories, this court believes that defendants' decisions were

5   sufficiently based in policy concerns to invoke discretionary-function immunity.  The first two

6   theories (assigning L.M. to the class and protecting M.C. from the original bullying incident) are

7   high-level policy decisions.  Assigning a student to a class involves considerations of class size,

8   teacher ability, socialization amongst students, and student educational needs, amongst other

9   things.  Indeed, the decision not to create a stricter supervision plan for L.M. is based on those

10  same policy considerations.  There are only so many resources that can be spent, and any

11  diversion of resources toward additional supervision of L.M. are resources that are diverted from

12  other students.

13      To look at that decision—or the supervision protocols that were put in place—and

14  question them now is exactly the sort of judicial second-guessing that discretionary-function

15  immunity is designed.  It is unfortunate that, as a result of those decisions, the bullying incident

16  occurred.  But defendants enjoy immunity from liability for them because, in making those

17  decisions, they exercised discretion based on policy considerations.

18      Likewise, the sixth theory fails for the same reason.  Setting aside the fact that plaintiff

19  makes no real argument as to this theory, nor presents any independent evidence for it, this sort

20  of broad critique of school policy is what discretionary-function immunity protects from.

21  Running a school involves myriad policy concerns, well beyond those that the court has already

22  listed.  The court will not step into an educational administrator's shoes to determine what the

23  correct decision should have been regarding defendants' alleged cultivation of a bullying-

24  friendly environment.

25      The remainder of plaintiff's theories are not barred by discretionary-function immunity.

26  They all involve more micro-level application of policy issues that the Nevada Supreme Court

27  has determined are not protected by discretionary immunity.  *See Payo*, 403 P.3d at 1278.  The

28  alleged actions were not based on forming any sort of policy, but, rather, involved an application

James C. Mahan
U.S. District Judge

1   of a pre-existing policy.  However, these remaining theories ((3) failing to address the bullying

2   incident, (4) failing to investigate L.M.'s threats, and (5) forcing M.C. to listen to an apology)

3   fail because there is no evidence that any of these acts were the proximate cause of the harm.

4        Nowhere in the record is there any evidence that specifically attributes M.C.'s harm to

5   either defendants' responsive actions or the apology.  The harm comes from the bullying incident

6   itself.

7        Plaintiff's only evidence of psychological harm (other than self-serving deposition

8   testimony) is Dr. Durette's expert psychiatrist report that attributes the harm to the "bullying

9   incident" itself.  (ECF No. 60 at 175).  Dr. Durette's deposition testimony attempts to broaden

10  this definition to include subsequent behavior, but Federal Rule of Civil Procedure 26 prohibits

11  an expert from expressing opinions beyond those contained in the expert's written report.  *See*

12  Fed. R. Civ. Pro. 26(a)(2).  While Nevada courts have recognized that expert testimony

13  regarding psychological damages are not always required to support a negligence action, *see*

14  *Farmers Home Mut. Ins. Co. v. Fiscus*, 725 P.2d 234, 236 (Nev. 1986), the court sees no

15  evidence expressly connecting the psychological harm to these three particular theories.

16       In the absence of any evidence of causation, the court must grant summary judgment in

17  favor of defendants.  Plaintiff provides nothing that ties the damages specifically to the

18  investigation/response to the bullying or to the apology beyond self-serving testimony.  The

19  proximate cause of M.C.'s harm was the bullying incident, not the fact that defendants did not

20  investigate or respond to the bullying as the statute dictates or as plaintiff would have preferred.

21  **IV.   Conclusion**

22       Accordingly,

23       IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion for

24  summary judgment (ECF No. 56) be, and the same hereby is, GRANTED.

25       IT IS FURTHER ORDERED that each of the motions for leave to file excess pages (ECF

26  Nos. 57; 64; 76) be, and the same hereby are, GRANTED, *nunc pro tunc*.

27  . . .

28  . . .

**James C. Mahan**
**U.S. District Judge**

1   The clerk is instructed to enter judgment and close this case.

2   DATED June 5, 2023.

3   _____

4   UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**James C. Mahan**
**U.S. District Judge**

- 26 -